JOSEPH F. TILDEN *v.* BENJAMIN B. BROWN.

One may maintain trover for a check, which is his property, although not
made payable to him, or negotiated.

If one purchase of a mail contractor his contract and stage property, with
the express stipulation that the postmaster, when the quarterly checks
are sent, shall deliver them to the vendee, and the vendor, notwithstand-
ing this, gets possession of one of them and converts it to his own use,
he is liable in trover.

Such order given to the postmaster in writing, by the vendor, is a power
coupled with an interest, and not countermandable.

THIS was an action of trespass on the case, counting, in
the first count, in trover, and, in the second, on the
special circumstances of the case. Plea, not guilty; issue to
the court.

On the trial, in the county court, the plaintiff introduced
evidence proving the following facts. Previous to Decem-
ber 1st, 1837, he purchased of the defendant all the stage
property owned by the defendant on the line between Mid-
dlebury and Royalton, and, on the 1st day of December,
1837, took a written assignment of a contract to carry the
mail, which had been originally made by the defendant with
the government ; but no transfer to plaintiff of said contract,
by the post-office department, had been made at the time
of defendant's taking the draft in question. After the first of
December the defendant ceased to have any interest in said
line of stages, or the mail contract, but the mail was there-
after carried by the plaintiff. Before closing the contract and
taking the assignment, the plaintiff required, as security to
to him, that the drafts, and all communications from the post-
office department, thereafter to be mailed addressed to the de-
fendant, should be retained by the post-master at Middlebury
and delivered to plaintiff, or sent to him at Rochester, where
he resided, and that the defendant should not receive nor take
any thing, except the draft for the quarter that would end
December 31st, 1837. The defendant thereupon executed
and delivered to the plaintiff a paper, directed to the post-
master at Middlebury, stating that he had sold his interest in
said mail contract to the plaintiff, and directing said post-
master to forward to the plaintiff at Rochester, Vt. all commu-
nications from the post-office department to the defendant,

except those for the quarter ending Dec. 31, 1837. The plaintiff notified the post-master at Middlebury of the contract, and sent or showed him the paper so executed by the defendant. The defendant agreed that the contract should be transferred to plaintiff, by the post-office department, and that an application should be made for that purpose.

A draft from the Post Master General, on N. Green, was sent to Middlebury post-office, for the quarter ending April 30, 1838, of the amount and description mentioned in the declaration, which draft was payable to the defendant or his order, and which he negotiated at the Bank of Middlebury on the 30th day of May, 1838. Afterwards he refused to deliver the draft or the money to the plaintiff, assigning as a reason that he had claims on the stage company across the mountain. After the plaintiff demanded the draft, or the money, as aforesaid, the defendant directed the post-master at Middlebury not to deliver any further communications from the Post Master General or the post-office department, to the plaintiff. Some drafts of the same description, and payable in the same manner to the defendant or order, were forwarded by the post-master at Middlebury to the plaintiff and were by him negotiable by signing the drafts as the defendant's agent. The defendant was embarrassed in his circumstances, and not responsible at the time of receiving the draft in question. Upon these facts the county court decided that the plaintiff could not recover in this action, on either count, and rendered judgment for the defendant to recover his costs, and the plaintiff excepted to the decision.

*C. Linsley*, argued for the plaintiff, and cited Chitty on Cont. 110, 130, 131 ; Shep. Touch. 224 ; 2 Stark. Ev. 6 Am. Ed. note, 835, 840 ; 35 Com. L. R. 54; Id. 218; *Robinson* v. *U. S. Ins. Co.*, 1 Johns. 592 ; 17 Com. L. R. 486 ; *Carter* v. *Jarvis*, 9 Johns. 143 ; *Kingman* v. *Pierce*, 17 Mass. 247 ; *Schermerhorn* v. *Van Volkenbugh*, 11 Johns. 529 ; 2 N. H. Rep. 66 ; *Roberts* v. *Wyatt*, 2 Taunt. 268 ; *Taylor* v. *Plumer*, 3 M. & S. 562 ; *Murray, et al.* v. *Burling*, 10 Johns. 172 ; *Jackson* v. *Anderson*, 4 Taunt. 24 ; ——— v. *Hayes*, 4 Term R. 260 ; *Ostrander* v. *Brown*, 15 Johns. 39 ; ——— v. *Barclay*, 2 B. & A. 702 ; *Lockwood* v. *Bull*, 1 Cowen, 322 ; *Buck* v. *Kent*, 3 Vt. R.

100; *Pierce* v. *Gilson*, 9 Id. 216; *Clowes* v. *Hawley*, 12 Johns.. 484; *Holland, et al.* v. *Osgood*, 8 Vt. R. 278; Chitty's Plead. 133; 4 East, 333; 3 Id. 12; *Brown* v. *Dixon*, 1 Term, 276.

*H. Seymour* and *H. Bell* for defendant.

I. Contracts for carrying the mail cannot be transferred nor assigned by the contractors, so as to give the person to whom it is assigned any claim upon the post-office department, for his services in transmitting the mail. The person to whom it is proposed to make the transfer must be first approved of as a suitable person to be entrusted with the mail, and the transfer be made at the department, before he can have any claim on the department for services. No such transfer had been made at the time the draft, in question, was taken by defendant. All the responsibilities rested on the defendant and his bail.

To sustain trover, it is essential that the plaintiff have a perfect and complete right of property, connected with a right of possession in the chattel converted. And if the plaintiff has never had possession, or if the contest be with one who will succeed in his proof of title, unless the plaintiff prove a better, it is necessary for plaintiff to resort to strict evidence of title. Stark. Ev. 832–3. 2 Sel. N. P. 1268. 1 Chitty's Pl. 150.

No property in the chattel converted ever vested in plaintiff; because, 1. The agreement made by defendant with plaintiff was executory and never executed. 2 Black. Com. 443. Powell on Cont. 234.

2. Property in a chattel, not in existence and not capable of immediate delivery, cannot be transferred. 2 Sel. N. P. 1268. 1. Taunt. 318. 4 Taunt. 647.

3. If any thing remains to be done on the part of the seller, between him and the buyer, before the article purchased is to be delivered, a complete right of property does not attach in the buyer so as to enable him to maintain trover. 2 Sel. N. P. 1268. 6 East, 626.

4. No right to the draft can in this case be derived by plaintiff in the possession which he never had. The paper directing the post-master at Middlebury to forward the communications from the post-office department to the plaintiff

at Rochester, was merely a direction to him as a public officer, having charge of the post-office, to forward certain papers to another post-office. The Postmaster was not the agent of the plaintiff to receive these papers into his own possession, so as to make his posession the posesion of the plaintiff. And even if he was the plaintiff's agent for that purpose, it does not appear that he ever did take this draft, or any other papers sent from the general post-office, into his own possession to hold for the plaintiff.

5. The property in negotiable instruments is, in some respects, different from that in goods; 1 Bos. & P. 650; and cannot be transferred except by indorsement in writing on the bill. 2 Stark. Ev. 245. Chitty on Bills, 109. 1 H. Bl. 605.

II. The second count in the declaration cannot be maintained. If it be regarded as an action on the case, in the nature of fraud, it cannot be a proper remedy in this case. No action for a tort can be sustained when the thing complained of is a mere non-performance of a contract. Otherwise every default in payment may be laid in tort, which will blend all forms of action in utter confusion.

The cases arising, *ex contractu,* where you may bring an action tortwise, are those where the *gravamen* of the thing complained of is misfeasance or malfeasance, in addition to a breach of contract. *Wright* v. *Geer,* 6 Vt. R. 161. *Stowell* v. *Wescott,* 2 Day, 422. *Dixon* v. *Clifton,* 6 Wil. 319. *Govet* v. *Radnidge,* 3 East, 62. *Buddel* v. *Wilson,* 6 T. R. 369. *Weal* v. *King,* 12 East, 452. 6 East, 331.

The opinion of the court was delivered by

REDFIELD, J.—The great question in this case is, whether the plaintiff had any such vested interest in the check as will enable him to maintain an action for its conversion. For if the property in the check had vested in the plaintiff, there can be no doubt he can maintain trover against any one who wrongfully converts it. It is not the person who last had the manual custody of the paper, or he to whom the check or note is made payable, who is to maintain an action for its conversion, but he who was the legal owner and beneficially interested in the check, or the money secured by it. The person entitled to sue upon a bill, check, or note, may maintain the action, as trustee, for the benefit of the owner. But

ADDISON,
January,
1842.

Tilden
v.
Brown.

the latter only can maintain trover for its conversion. The case of *Kingman* v. *Pierce,* 17 Mass. R. 247, is in point. That was trover at the suit of the holder of a promissory note, who was owner also, but the note was not payable to him, nor does it appear that the note was negotiable, or, if it were, that it had been indorsed. The suit is against the maker of the note, who had obtained possession of it, as he claimed, by payment, but the court considered it no pay-payment, and sustained the action for the money secured by the note.

In this state, trover has often been maintained to recover for the converson of the paper of a promissory note, after it had been paid, when of course it would be wholly unimport-ant to whom the note was payable, or into whose hands it had come, if he withheld it from the maker who had paid it. In the cases referred to, however, the note was in the hands of those who had been owners while it remained unpaid. *Buck* v. *Kent,* 3 Vt. R. 99. *Eastman* v. *Potter,* 4 Ib. 313. *Pierce* v. *Gilson,* 9 Ib. 216.

The case of *Clowes* v. *Hawley,* 12 Johns. R. 484, is that of a bond, not payable to the plaintiff, but assigned to him, and executed by the defendant, and which he detained from the plaintiff, who was entitled to it. The action was fully sustained. I shall take it for granted, then, that if the plaintiff was the owner of the check, whether it was made payable to him, or had been properly indorsed or not, he may maintain this action for its wrongful conversion.

I will first advert, briefly, to some of the reasons urged why this action will not lie. The objection, that the check has not been properly negotiated to plaintiff, has been suffici-ently answered.

An extensive class of cases is referred to in order to show that, on the sale of personal chattels, the title does not vest in the vendee so long as any thing remains to be done by the vendor. This proposition is undeniable, but cannot affect the present case, as here nothing more remained for the de-fendant to do. He had released his whole interest in the contract to the plaintiff. So far as he was bound to the post office department, for the fulfilment of the contract, he stood in relation of a surety to the plaintiff, merely. The plaintiff was the owner of the contract, not only by purchase,

but he had entered upon its performance and had continued to fulfil it. It was his own business. The defendant was under no obligation to pay him one cent for his labor, nor did he guaranty that the government should. If they could be supposed to have become bankrupt, or to have refused to fulfil their contract, the plaintiff would have suffered the loss.

But it is said the check not being *in esse* at the time of the contract, nothing could pass until it was formally delivered by the defendant. This is true, in those cases where the right to the thing rests merely in contract, and the thing itself is to be procured by the obligor, and, not being specifically designated, remains at his risk until delivered; as in the case of *Mucklow* v. *Mangles*, 1 Taunton, 318, where the court considered that no particular barge was designated, and therefore it was a mere contract to deliver *a barge.* But in the case of *Woods* v. *Russell*, 5 B. & A. 942, a more recent and well considered case, where the bankrupt contracted to build a ship of a given description, and the defendant paid the price by instalments, as the work progressed, it was held that the title of the ship vested in him, and for taking it away he was held liable only for the balance of the price. This is the general rule in regard to all manufactured articles, made to order. The title vests in the vendee when the article is finished, subject to the vendor's lien for the price. So, too, in all cases of sale of personal chattels, when the contract is complete, and the price, or earnest, paid, as between the parties, the title passes without delivery. And this is especially the case where not only the vendor has done all which he is to do, and the full price is paid, but the very chattel, or thing, is produced by the labor of the vendee. If one contracted to sell a manufactured article, to be made at the vendor's shop, (and of his stock, if you please,) but by the labor of the vendee, or the increase of stock, and in the mean time the vendee to keep the stock, can it be supposed that, in either case, any formal delivery would become necessary in order to pass the title. The very supposition is almost too bold a proposition for grave argument, when it is remembered that the price is paid in advance.

But if it were necessary, in the present case, to show a formal delivery, even, it seems to me that the order to the

post-master at Middlebury to forward all communications from the post-office department, addressed to defendant, to the plaintiff, was equivalent to a delivery. The post-master was thereby constituted the mutual agent of the parties, to be the conduit, in whom and by whom this should be effected. When the check came into his hands, it was as much in the possession of the plaintiff as if he had obtained the manual custody of the paper, whether it were enclosed in a letter, or not. Under this state of the case, had the plaintiff, instead of the defendant, taken possession of the check, even after the order to the post-master had been, in terms, countermanded, will it be seriously argued that the defendant might have maintained trover for it? Yet this is but a necessary consequence of the proposition which is contended for on the part of the defendant. And, in this view of the subject, the defendant might now maintain trover for all the checks which the plaintiff has taken from the office since these counter orders were given to the post-master.

But it must be obvious, I think, that this order, given to the post-master at Middlebury, was a power coupled with an interest in the plaintiff, and in no sense countermandable. It is a familiar principle of the law that any power, which is given upon consideration, or, which is the same thing, when the appointee, or he for whose benefit the power is conferred, foregoes some advantage in order to induce the giving of the power, or places himself in a different position from what he otherwise would, the power thereby becomes irrevocable. That is precisely this case. This power of retaining the checks for the plaintiff was given to the post-master for the indemnity of the plaintiff against loss. It might have been, and, from what appears in the case, very likely was, an important consideration in the contract. The contract was entire, and is no longer executory, having been executed by both parties, neither party retaining or having any power to rescind it. Can it, then, with any show of sound reasoning, be argued that the order to the post-master was countermandable at pleasure? Surely not.

The check, then, in every view of the subject, being the property of the plaintiff, either with the actual possession by the his servant, or the right to immediate possession, which is same thing, he may well maintain this action for the money

secured by it.  The case is much the same as if the plaintiff had originally taken out the contract in the name of the defendant, by his consent, (which is not an uncommon case in these matters, I apprehend, in order to secure the good will and credit of a former contractor,) but with the understanding, that he, in whose name the contract stood at the department, should have no interest or concern in it, except perhaps to receive a bonus for his countenance and good will. Under this state of facts, we may suppose one of the quarterly checks to come into the hands of the nominal contractor, and he having some just, or simulated, claim against the real contractor, puts the check to his own use, and gravely insists either that he will not be sued at all, or, at all events, not in the form of an action of trover.  We could only consider him as holding the check merely in the capacity of a trustee for the person whom he had permitted to use his name.  He would be in effect a mere depositary.  The money, when obtained, would be that of the real contractor, and he could maintain trover for it.  The present case is precisely the same in principle.  The plaintiff may maintain trover for the *money even*, so long as he can identify it.  *Jackson, et al.* v. *Anderson*, 4 Taunt. 24; which was trover for 1900 (spanish-milled) dollars.  So, too, where the trustee has wrongfully converted the trust money into other property, the owner of the money shall have trover for the property purchased with it, as long as he can trace it.  *Taylor* v. *Plumer*, 3 M. & S. 561, which was where a bankrupt had wrongfully converted money, given him to buy exchequer bills, into American stocks.  The plaintiff was allowed to maintain trover against the assignees for the avails of the stocks purchased thus wrongfully with his money.  In pronouncing judgment in the case, Lord Ellenborough, well says, ' An abuse of trust can confer no ' rights on the party abusing it, nor on those who claim in ' privity with him.—The doctrine, that the property in the ' thing ceases when it is tortiously converted into another ' form, is mischievous in itself and supported by no authority ' of law.'

In every view, then, which we can take of this case, we think it clearly maintainable, either for the check, or the money.  We are the more reconciled, not to say gratified, at this result, from the consideration that it does meet the

obvious equity of the case. There can be no doubt the parties, at the time of entering into the contract, did expect the same consequences to follow from the contract, which we have now sought out and applied. There can be little doubt that the suggestion, at the time, of a contrary result, would have either broken off the negotiation, or have induced a resort to other forms of effecting the desired object. This is fairly inferable from the very great pains which were taken to exclude the defendant from retaining any possible control of the quarterly checks. It is the basis and the only legitimate object of all rules of construction, to make contracts speak the sense of the parties. If this result is secured, courts need not feel alarmed by any foreboding, or prognostication, even, of the fearful calamity which may be expected to befal either the principles or the forms of the law. I know it is difficult always to steer evenly between the extremes of disregarding the particular equity of a case, on the one hand, or the settled rules and formulas of the law, on the other. Neither should ever be lost sight of. Both are important; and, in a clear case, no doubt the particular equity should yield to established precedent and principle. But in a wise, judicious, and cautious administration of the law, it is believed these conflicts will be found much fewer than is sometimes apprehended. It is the great boast of our law that its forms may, without violence, be so moulded, as to meet the absolute justice of all cases. Here is a controversy about something more, I apprehend, than the mere form of the action. For if trover cannot be maintained, it is because the money realized was not the money of the plaintiff, and if not the money of the plaintiff, then whose was it? Surely the defendant's. He of course cannot then be liable for this same money, in general *indebitatus assumpsit*, for money had and received. If he is liable at all, it must be upon his contract. This provides for no such contingency, for the best of all reasons, that the parties did not so understand the matter. The contract provides no more indemnity against the defendant taking these checks, than against his taking the horses, or carriages. The result is, if we deny this remedy, we do either deny all redress, or turn the plaintiff over to a remedy which the parties never intended, and, by consequence, did not provide for. Hence, if this case were even doubt-

ful, in regard to the *form of redress*, which it is not, I should be more inclined to take the view which conforms to the right and justice of the particular case, and the intentions and expectations of the parties, in regard to the contract, than one which violates both these, in pursuit of some distant anology, to some, perhaps, more questionable precedent, than the very case under consideration would make. When cases are decided with a leading reference to their justice, it generally turns out, when they come to be analyzed fully, that they are in conformity with the just principles of the law, and fully reducible to its most approved formulas. And not a few of those cases where the acknowledged equity of the cause has been sacrificed to some supposed regard to precedent, or to principle, even, when they come to be subjected to the severer scrutiny of time, have been found to have violated both precedent and principle. Hence I always feel safer, in a point which to my mind seems doubtful, to regard more the justice of the case than any nice and uncertain analogy, trusting to other minds to see the reason for what I feel to be just. But, in the present case, I could not esteem it even doubtful whether the judgment now declared is in conformity with the established forms and precedents, were it not that two members of this court, who have twice heard the argument at the bar, either hesitate, or dissent from this judgment, which is but the opinion of three of the members of the court.

Judgment reversed and new trial.

BENNETT, J., Dissenting. To maintain this action, the plaintiff must have been vested with a property in the draft, connected, at least, with a right of possession. Actual possession alone is not enough, in this case, against the defendant, inasmuch as he does not stand as a stranger. If the property in the draft was in fact vested in the plaintiff, it is no objection to this action that it had not been so negotiated to him as to transfer the right of action upon the paper itself; but the great objection to the action, in my mind, is the want of a vested interest, or property, in this specific draft, in the plaintiff. And it is to be remarked that the action is for the conversion of the draft itself, and not for any specific moneys which the defendant has received by means of it.

One of the requisites of a contract of sale, is, that the thing sold must be *in esse*, at the time of the making of the contract; that is, it must have an actual or potential existence, and be capable of delivery, otherwise it is but an *executory* contract and conveys no legal title to the thing, which was the subject matter of the contract. The right of property does not pass. It is true, as between the parties, the right of property and of possession may pass to the vendee without an actual delivery; but this presupposes that the subject matter of the sale was definite, ascertained, and capable of immediate delivery. In *Robinson* v. *McDonnell*, 5 M. & S. 228, there was a transfer by deed of the freight, *earnings*, and profits of a ship. In an action of trover for oil, which was the produce of whales taken on the voyage, it was held there could be no recovery. So the sale of wool, which shall thereafter grow upon the vendor's sheep, passes no property. The subject matter of the sale was not *in esse*; the vendor had not, at the time of the contract, either actually or potentially, the thing sold, but only, as it is said, *in possibility*. *Wood & Foster's* case, 1 Leon. 42. *Grantham* v. *Hawley*, Hob. 132. In *Mucklow* v. *Mangles*, 1 Taunton, 318, trover was brought for a barge, and although the party who had ordered it built, had paid money on account, equal to the price, and his name had been painted on it by the builder, yet it was held that the vendee had acquired no property in it for want of a delivery. It will be seen that the bargain did not provide for the advances to be made, and they do not seem to have been regulated by the progress of the work, and though no particular barge had been designated in the contract, and could not well be, it being afterwards to be built, yet, when built, the vendor had designated it, and, in effect, set it apart for the vendee. *Laidler* v. *Burlinson*, 2 M. & W. 602, is similar in principle. In the case of *Woods* v. *Russell*, 5 B. & Ald. 942, which at first might be thought to conflict with other cases, yet, by the terms of the contract, the ship was to be built under the superintendence of the agent of the purchaser, and given portions of the price were to be paid, and were paid, according to the progress of the work, and it was considered, in effect, as a purchase of the specific articles of which the ship was built. Besides, the ship builder had sign-

ed the certificate, to enable the purchaser to have the ship registered in his own name. In *Clark* v. *Spence*, 4 Ad. & E. 467, the same principle was recognized. In *Ward* v. *Shaw*, 7 Wend. 404, it is held that when any thing remains to be done before the sale can be considered as complete, whether to be done by the vendee or vendor, the right of property does not pass to the vendee, as between the parties themselves, though the property may have been placed in the possession of the vendee. Indeed these principles are too well settled to admit of debate. The only question I consider there can be, relates to their applicability to the case before us. Brown was the contractor with the government to convey the mail, and, on the first of December, 1837, assigned over his interest in the contract to the plaintiff, but the post-office department had not recognized the assignment, or in any way discharged Brown from his liability to that department. All the responsibility still rested upon him and his bail, and to them could the government *alone* look for the fulfilment of Brown's contract, and, upon such fulfilment, Brown became the creditor of the government, and it made no difference that his assignee had in fact carried the mail, so long as the government had not recognized the assignment. So far as respects the government, Tilden was but the agent of Brown, and it was of no importance that, as between Tilden and Brown, the latter ceased to have any interest in the contract after the assignment. The government being debtor to Brown, and the draft given him being in settlement of such indebtedness, it became, as I think, when enclosed to him by the post-office department at Washington, his property. The case finds that the plaintiff, before closing the contract and taking the assignment, required, *as security* to him, that the drafts and all communications addressed to the defendant, from the post-office department, thereafter, should be retained by the post-master at Middlebury, and delivered to the plaintiff, at that place, or else forwarded to him at Rochester, and that the defendant should receive nothing except the draft for the quarter ending December 31st, 1837. The plaintiff's action is brought for the draft given for the quarter ending March 31st, 1838. At the time of the contract between the parties, no such draft was in being; no indebtedness existed on

the part of the government, at that time, for which it was given, the consideration having been rendered the government after such time, by the defendant, through his agent or assignee, and as the government never accepted such assignee, the relation between them and the defendant is unimpaired by reason of the assignment.

Here, then, is a case where the thing sued for is not only made long after its pretended transfer to the plaintiff, but every thing was thereafter done to entitle him to the draft from the government, and, in legal effect, to be done by the defendant himself. How, then, can a contract that the plaintiff shall have the avails accruing to the defendant, from the government, upon a subsequent performance of his contract with them, be but an *executory* contract? To my mind this is exceedingly clear, however it may appear to others. If this contract has been violated by the defendant, the plaintiff has a plain remedy upon the contract. itself, or in an action for the moneys received, and I perceive no good reason, growing out of the equity of this action, that should induce the court to labor to sustain an action founded in experiment, and in contravention, as I think, of general principles and well marked boundaries, limiting the different kinds of action.

Having come to the conclusion that the draft, when made by the government, and, in effect, delivered to the defendant, by its being mailed to him, vested the property in the draft in him, it remains to be inquired, whether there is any thing in this case to show that, at any subsequent time, the defendant was *divested* of, and the plaintiff *invested* with, the property in this draft. All that we have is that the draft in question came to the post office at Middlebury, enclosed to the defendant, and that the post-master had previously been notified of the contract between the parties to this suit, and of the order given by the defendant upon him, under date of the 16th of December, 1837, and that the post-master, instead of delivering the draft to the plaintiff, delivered it to the defendant, who negotiated it at the bank, and refused to let the plaintiff have either the draft or the money. There is no evidence that the post-master assumed to become the agent of the plaintiff or of the defendant. All that the case finds is that the plaintiff notified him of the contract and either

sent him or showed him Brown's order upon him. The draft came into the possession and custody of the post-master at Middlebury as a public officer, whose duties are pointed out by law, and not as the agent of any one. Though he might have been justified in delivering the draft to the plaintiff, yet he did not do it; and in the absence of any agreement on his part so to do, it can hardly be contended that the plaintiff could have an action against him in consequence of his failure to do it. If the draft, when mailed at Washington, became the property of Tilden, what transpired at the post-office at Middlebury can be of no importance to the rights of the plaintiff in sustaining this action. If it did not, but was the property of the defendant, it is quite beyond my comprehension to see that what transpired at the Middlebury office should have any effect in changing the ownership of the draft. Without the right of property, it cannot be contended that the plaintiff can sustain this action. It does not follow, from my views of the case, as contended upon the argument, that, if this contract, which I esteem but as *executory*, had been *executed*, and the drafts had passed under it into the possession of the plaintiff, the defendant could have maintained an action against the plaintiff to recover either in trover for the drafts, or in assumpsit for moneys received upon them. The contract, *executed* by the parties, would be an ample answer.

It it is hardly contended that a recovery can be had on the second count in the declaration. To recover in tort, there must be, in the case of contracts, superadded to the breach of them, a *malfeasance*, or *misfeasance*, which must be the *gravamen* of the complaint.

But, as the case is put entirely upon the count in trover, I will not extend my remarks relative to this count, and will only add that, in my opinion, this action is not maintainable, and that the judgment of the court below should be affirmed.